Thank you, Your Honors, and may it please the Court, I'm Alan Gura for the Appellants. Because the Court will be publishing a recording of these proceedings on the Internet, the is an export to which ITAR controls might, in their exclusive and unknowable judgment, apply. And if anyone here were to seek a license to export our speech, the defendants could deny that application, if doing so would, according to the defendants, quote, be in furtherance of world peace, the national security, or the foreign policy of the United States, or is otherwise advisable. Mr. Gura, let me ask you to start off and address the reason the District Court declined to grant your injunction, and that was that the government and the public's interest in national security and national defense edged out your interest in the First and Second Amendment rights on, that's two of the three merits requirements, and as you know, you have the burden of persuading us that you've carried the day on all four. So, just about all your brief relates to the other issues, the constitutional issues. So, I'd like to hear your side of the story as to why the District Court abused its discretion in finding that the government's interest in national defense and security of its citizens didn't outweigh your constitutional issues. Well, Your Honor, the District Court made various errors of law, and errors of law are obvious, de novo. The District Court applied the wrong law in various respects. First of all, we don't dismiss or discount the idea that the U.S. has substantial national security interests in controlling the export of technical data. However, because we are dealing with a prior restraint, it's the government that bears the burden of proving, always, that this meets constitutional standards. The government has to satisfy the freedom standards of Vermont. But you have the burden of proof of showing you're entitled to the injunction, and why is the District Court abused its discretion in finding that the interest of the government and the public didn't outweigh your interest in privacy or speech or Second Amendment? Because the District Court did find that we were talking about protected First Amendment speech. The government challenged our claim that this is expressive speech. The District Court found that, in fact, it was going to apply First Amendment standards. And once the First Amendment kicks in, the government, then, has to show, has to justify the burden that the prior restraint is appropriate. Well, why don't you just tell us, then, why your interest in the First Amendment outweighs the government and the public's interest, the first two elements of a temporary injunction? Sure. Well, people have a right to speak. They have a right to express themselves. They have a right to share information with their fellow Americans. And, in fact, while there's no right to provide direct technical assistance to foreigners in the manufacture of arms, there is, indeed, a right to communicate with people generally. And when the government— I don't question that. But the question is weighing the balance between the government and the public's interest, and defense distributors' interest in speech and privacy and the other constitutional rights that you assert. Don't you have to start with the idea that this defense—whatever that munitions list is—includes indiscriminately all guns? It includes not only that, Your Honor, it includes just about anything that a person might imagine. The 21st category of the— I don't care about the 21st category. We're talking about all guns except for BB guns and pellet guns in that first category of guns and ammunition. And therefore, includes even potentially all the websites that we found on the Internet that have to do with gunsmithing, right? That's correct, Your Honor. There is a substantial amount of speech about an item that Americans have a constitutional interest in obtaining and using that the government would censor on the allegation—a very speculative allegation—that national security demands this. And we need much more than a speculative assertion of national security. It's not enough to simply come into court and say, national security, this is important. Let me ask you this. What practical and legal use is there for a single-shot 3D printed plastic handgun? Well, I would not question the practical use that a person may find in any particular weapon, but there is definitely practical use in defense distributors and other people's ability to express themselves, to share information in the knowledge of how these things are designed and made. We're talking here about the First Amendment and the Second Amendment are different items here. In the First Amendment— There's no question, is there, Counsel, that this information is fully legal to be distributed anywhere within the United States? That's correct, Your Honor. There's no question about that. We're talking about the right of the government to regulate the export of the technical data that would make a weapon that I just described to you. And if the government wants to do that, then the government can regulate the export of technical data, provided that it does a few things. First of all, as the Ninth Circuit found in Edler, the government should show that there is specific intent to actually aid somebody overseas in the manufacture of the weapon. There's a difference between sharing information generally, which a foreign person might use to create a weapon, and providing direct technical assistance to somebody in the manufacture of the weapon. And that distinction is critical. It underlies every act of Congress that deals with the criminalization of speech that's related to conduct. For example, the Espionage Act, the Atomic Energy Act, we can go on. Can you give me a single practical legal use for a plastic handgun that could get through many security devices? We don't, we would not agree that this gun would pass through very many, if any, security devices. But it would this courthouse. I don't think so, Your Honor, for a variety of reasons. First of all, if you follow the directions that, and I don't want to speak too much about the specific directions here, obviously, but if the directions are to be followed, it requires the insertion of the minimum required amount of metal into the gun. And also the shape and form of this gun would show up on just about any screening instrument there is. Well, it has to have a metal pin, does it not? And the pin itself is metallic, and of course, any ammunition that it might fire would also be metallic. This gun is not impervious to detection. That's not... Well, but it's easier to get through than an ordinary gun, isn't it? I wouldn't know that, Your Honor. I'm not in the business of sneaking guns in the courthouses, but I can tell Your Honor that this would show up as a gun. It has metal content, and there is a purpose in having it. The purpose in having it is so that people can, number one, use it. People like using firearms, they use handguns for many reasons. They can use handguns that they make for self-defense, for example. Traditionally, Americans have made handguns themselves. Getting back to this, what the district court decided, he did not find that this is a content-based regulation of speech, and therefore, he subjected it to intermediate scrutiny, and it would seem to me that if it's content-based, then there is a much higher burden of proof and a higher burden, a correspondingly lower burden to prove the balance of harms and so on. That's correct, Your Honor. We contend that that was erroneous under Reed v. Town of Gilbert. The Supreme Court has now very recently given us very clear instruction as to what content-based means. This is a content-based restriction. The government is restricting speech based upon its subject matter. It doesn't matter that they have a neutral viewpoint. It doesn't matter that they have a benign motive. The fact is— So the Ninth Circuit opinion at Chimack was just wrong? Which Ninth Circuit opinion? The one that said, and I may be mispronouncing it, but it's the one that said you apply intermediate scrutiny. Chimack. Chimack. Chimack. The H-I-M-A-K. Chimack is distinguishable for a variety of reasons. First of all, the First Amendment issue in Chimack was up on plenary review. It wasn't argued below. Second, Chimack involved actual smuggling. It was direct assistance. The man had a disk full of stolen, encrypted naval technology, and he was on the airplane and he was going to take off to China with it. That is very distinguishable from— Regulations you're talking—we're talking about. Sure. ACAR and I— That's right. The— Are those the two we're talking about? The ITAR and the— Yeah. The ACAR, yes. Those are the same two that were involved in Chimack. Yes. The conduct in Chimack was criminal. There was specific intent, and it would have passed even strict scrutiny because at that point— Classified material. You had classified material. It was encrypted. There was direct assistance. It was a specific plan. to subvert this country's national security. Here we're talking about general education in material, and while it's true that information about these arms or other technical data could be used by nefarious foreign forces, it is also possible for terrorists to steal a book from the public library that has to do with chemistry or physics, take that overseas, or do something nefarious with it. But the distinction is in the Ninth Circuit in Chimack, followed by Edler, Edler— I guess you don't agree with me that stealing a book with a recipe in it is not what we're talking about here when we're talking about giving—using CAD files that actually allow that you can print out a weapon. That's a little bit different than getting a recipe for how to make something. Actually not, Your Honor, because we would disagree with that. The CAD file is not executable. It is not itself functional. The CAD file is more like a blueprint or a recipe or a sheet of musical notes. It's something that a person can understand. It's also something that perhaps the 3D printer can understand and follow the instructions set to manufacture whatever is being instructed on manufacturing. But it is not in and of itself—and the government agreed with us below here. The government, I think, admitted that this is not software, and even software has First Amendment protection because software is expressive. It's code that humans can relate to and understand. Here we're dealing with open source design files. The whole point of this is that people can exchange the files, read them, understand them, modify them, learn from them, and exchange information. Now, if some of those people happen to be bad actors, then they are—they stand in no different place than any other bad actor who reads a textbook or a recipe or anything else. Is it legitimate to discriminate here between classified and unclassified information from the standpoint of protecting the government's interests? The government has a much greater interest in protecting classified information, which is produced oftentimes under government contracts. No, but are you saying that there are—are you agreeing that there are circumstances where unclassified information could fall under these export rules? There are. There are circumstances where if you take information which is in the public domain and you nonetheless use that information to provide direct material assistance to somebody that would violate the ITAR, at that point, the government would have a much better case. The conduct here has to be related to the national security interest, which is we don't want people exporting weapons without a license.  And so if we impose what the Ninth Circuit has done, a SANTA requirement, if you have the actual specific intent to help someone overseas do these things, you are in a different category. At that point, you are in the same place as you would be if you were charged with an Espionage Act violation or any of the other various laws that require specific intent. But here we have a strict liability offense for people who— a ghost gunner, to build AR-15s or export them or put them on the Internet, anybody can download them, then what's to prevent a drug smuggling group in Mexico or a terrorist organization anywhere in the world from taking those off and manufacturing an unlimited number of AR-15 rifles? The same thing that would prevent that same group from getting a gunsmithing manual and using it to their advantage, from going to the Internet website on how to make a gun and seeing what comes up, which is to say nothing, really, because, you know, it's a fact of life that bad actors use information, and there's nothing we can do about it. I downloaded this article from the Wired magazine where this totally untrained guy went in, got a ghost gunner, and very easily made an AR-15 after he had tried to do it with regular shop machines. And it seemed pretty clear to me from that that it's a whole lot easier and takes a lot less training to make an AR-15. Oh, I'm sorry. No, I'm sorry. Doesn't he have to buy the ghost gunner first, which is a device? That's right. And in fact— That device is legal. All he needs is his plans. That would require a license, if—would it not? Actually the ghost gunner— Exporting a ghost gunner. No. The ghost gunner itself, the machine itself, was determined not to be controlled by ITAR. It's the project files that the government had a problem with. And what's interesting here is nothing controls the export of 3-D printers. 3-D printers are not considered to be sensitive. It's the same—in the same manner that we don't— Control the export of computers. That's right. Computers can be used to generate propaganda for the government. All they need is your plans to make the AR-15 or the plastic gun. I'm sorry, Your Honor? All they need are your plans to make either the plastic gun or the AR-15, either plastic or metal. Isn't that right? That's right. And that's information that Americans— I mean, is that right? That is correct, Your Honor. If a person has information on how to make a gun, the person can make a gun. Before this ruling, which took two years or more, had the government ever sought to require a technical data license prior to publication of any gun-related material? Not that we're aware of, Your Honor, and this was a complete surprise. In fact, Your Honor, the government had consistently said that they did not impose a prior restraint on technical data. And this goes back—we have a stack of memos from the Justice Department going back to 1978 where they said over and over and over again, we don't believe the Congress authorized the State Department to use ITAR like this. It would violate the First Amendment. It would raise serious constitutional concerns. And in fact, the State Department responded to that when the House Committee in 1980 told them, please respond to the 1978 memo that the Justice Department wrote. What did the State do? In 1984, they amended the regulations. They removed that old footnote three from ITAR, which is in the brief, and they said, we want to make it clear to everybody. We want to address the First Amendment concerns, and we're not going to use ITAR as a prior restraint on public speech. They took that litigating position in Bernstein in the California case. By the same token, have they sought any regulations concerning drone technology that you're aware of? Any licenses? I'm unaware of that, Your Honor, but going down that road, they can seek to regulate just about any modern invention, just about anything. That's the whole point. Any possible invention. Anything and everything can be used by foreigners and foreign governments in nefarious ways, but we don't prevent people from learning and exchanging information just because we can conjure some hypothetical situation that would have... On your marketing video, I saw you feature someone shooting an AR-15 that's fully automatic. It's a machine gun, and I'm just curious as to why you would prominently display that on your website. To address that, Your Honor, we had a footnote, I think, in the brief that specifically addressed that or meant to address that, and here's the issue, Your Honor. That was done sort of in jest. The ghost gunner, as we declare, does not come with the jigs necessary and the code necessary to make a fully automatic weapon. Defense Distributed does not distribute that to anybody. That is, they do have a license... Semi-automatic? Semi-automatic, yes, but not a fully automatic, and they do have a license from ATF to produce that particular arm that you referenced, and we do not contend, and this is very important, and I see I'm into my rebuttal time, so I'll wrap up real quickly. The First Amendment protects broadly information. The Second Amendment comes into play only if we're dealing with information related to Second Amendment arms, which is a much narrower category, so we don't claim Second Amendment protection in other items just because information in those items is something we can share. I'm in my rebuttal time, so I'll... Okay. Thank you very much. Thank you. Okay. Mr. Taney? May it please the Court, I want to just start by making clear what we're talking about here. The plaintiff submitted a commodity jurisdiction request for specific computer files, and those computer files have the functional ability, as the previous discussion indicates, that you can, using your 3D printer, using these files, you don't have to read them, you don't have to look at them, you don't have to understand them. You can... They're out there on Pirate Bay today, are they not? That's what the plaintiff says. I haven't gone through all the websites and see if they're there. The question here is whether the government has a legitimate interest and what the nature of that interest is in regulating, making these files available in foreign countries. Is this a fact-specific determination by the State Department, or is the State Department going to start to regulate drones and gunsmithing and, you know, model rockets and everything else that a suspicious foreigner might get his hands on? Your Honor, there's a fact-specific determination that's made, and there's a U.S. munitions list that lists specific items, and the State Department... Guns. Right. And, well, with respect to the question about gunsmithing, as we indicated in our brief, and as Your Honor's questions indicated, the regulations do not prohibit dissemination of information about guns, about gunsmithing. That is in... There's a number of reasons. The most common would probably be that a lot of that material was already in the public domain. Why is 3-D printing not in the public domain? Well, the fact that you... The facts about 3-D printing, information about 3-D printing, books about 3-D printing, no one is saying that those are subject to these regulations. What we're talking about... Your Honor, I... You're just talking about putting them on the Internet in your counterfactual description of what exporting is, but this is my question, too, with a sub-question. A, why couldn't the plaintiffs have simply downloaded the link to this entire prohibited deal on their brief, which would have been public record, and gone into the public record and the court records, and with complete impunity from the State Department? And B, why couldn't they simply deliver this information to all of the major public libraries in the United States, and then say, hey, it's in the public domain? Well, I mean, the question of whether you can put something in the public domain and thereby escape the regulations, the State Department has never taken that position, and that would just gut the... But you're saying that there is no prohibition under your... Because your regulations clearly talk about the public domain being libraries and magazines and books, and you say... And you explicitly, I concede, that they could put their information out by any of those media, that the only thing that is, quote, quote, exposed to foreigners is the internet, which is incredible. Your Honor, I'm not sure I'm understanding your question quite right. I'm not sure that we're saying that you can put it out in those media. The point is, if you have... Yes, I think you clearly said that at one point. My point is that if there's... Is that correct or not? I don't believe it's correct, and let me just explain what I meant, Your Honor. If there's material that is already in the public domain, and you want to further put it out, or you want to even export it, you want to send it to somebody overseas, that's fine under the regulations. And with respect to materials about gunsmithing, information about gunsmithing, information about 3D printing, that would all not come on... I mean, there may be... But as a general matter, much of that information is already in the public domain, and the State Department doesn't claim that if you export it, you're violating the regulations. The point is, if you have something new... And of course, plaintiffs are here talking about firearms, but their argument would apply equally if you had the plans for the latest stealth bomber, or you had a blueprint for... Those are classified. Your Honor, that's not correct. Those are not classified. Plans for stealth bombers. I don't know stealth bombers specifically. There are a lot of munitions, high-tech, recent munitions, that are made in cooperation with government contractors. And they might meet the standards for classification, some of them, but they are generally not always classified. Government contractors, I suspect you have specific provisions preventing unauthorized disclosure that go way beyond these export licenses. Isn't that likely? I don't know what's in the contract specifically. I can tell you as a factual matter that the way this is all governed, the way information is governed, because of course, a lot of these contractors have foreign affiliates that they work with, have foreigners who work on these things. The way this is governed, this is a scheme of regulation. This is what we're talking about, the ITAR. That's how you determine under what circumstances you can send... When has the State Department sought to regulate, quote, guns by preventing pre-publication of anything? Give me some examples. Your Honor, the State Department hasn't, I don't know if there are any examples, but there certainly aren't a lot, but that just underscores the narrowness of what we're doing here. No, excuse me. What that proves is that the ITAR regulations have been in effect for 60 years, and you've never thought it, seen it necessary, and I'll bet there have been developments in conventional gun weaponry in 60 years. Your Honor, if you speak, when you're using the term guns, and asking me to speak... I'm not using it. The Defense Munitions List calls it, quote, guns, everything except BBs, pellet guns, and the ones that are, you know, above .50 caliber. Your Honor, I can't speak, and it's not in the record, about whether there are types of weapons that there have been developments that have been covered under the ITAR. What we're talking about here is basic handguns, and so I understood your question originally to relate to that. And if your question is, has the State Department regulated information about basic handguns under these regulations as a general matter, the answer is no. And that underscores that what we're talking about here is not something where we're saying any information about gunsmithing, or if you write a book, or, you know, scientific and academic exchanges are regulated under these regulations, and that goes to the point that was at issue in Edler, the point that was at issue in the Department of Justice memos that counsel has referenced earlier, and the point that was issued in Bernstein, which is those were circumstances where there were people who said, we want to have scientific and academic exchanges, and we're concerned that your regulations are written sufficiently broadly that those would be prohibited. And that was the problem that was perceived, and that problem has been addressed, but that's not what we're talking about here. We're talking about a functional, we're talking about something that doesn't teach a person something, it teaches a computer. And that's what the Second Circuit talked about in the Corley case when it talked about the decrypting DVD software, and they said, yes, maybe a programmer could read it, but this is being regulated based on its functional content. Is there a difference between, say, a defense distributor put these plans in a scientific book that goes in every library in the country, or half of them? Is there any difference in that and putting it on the Internet? Well, I mean, I think when you're talking about a book, of course, that would be something that a human would have to read and then would have to... Well, they could, I assume they could either put it in there or put a reference to it on the Internet. Yeah, I mean, I think, if your Honor's question relates to the mechanism by which it's distributed, I mean, that could be relevant in a particular case, although... Does the State Department purport to regulate that, putting it in library books or books going into libraries? I mean, the State Department hasn't faced that issue, Your Honor, so I don't want to get out ahead of them. I think if the question relates to if you wanted to, if it was a genuine scientific book, then you start talking about some of the issues, and there are exceptions in the regulation, and I can't prejudge how they would apply here for things about fundamental research, about academic settings, and those weren't invoked here because there's no claim that those are at play here, but if you had a particular case where somebody wanted to do a particular thing, then the State Department would have to apply those provisions. So a ruling here certainly wouldn't address that. Ruling for us here in affirming the district court here, either on the merits or on the preliminary injunction factors, wouldn't say anything about what would happen in that case. Of course, the problem with prior restraints is that it has an inevitable chilling effect on the free discussion of ideas, and we are assuming this is speech, and it is clear to me it's a prior restraint, and how do you avoid the idea that this is chilling for anybody who wants to publish anything on the Internet to say nothing of by other media? Well, because GUNS is the auspices, quote, export being available to any foreign person, I hate to tell you, but Houston is probably at least 25% foreign-born persons. If a person, I don't think a person understanding what the State Department has said or anything that we're asking this court to write an opinion could think that if you published If that's so, then there were 9,900 comments to your regulation proposed last June that finally answered these people's request for a license and said that export means anything available to any foreign person. Your Honor, what I was getting at was the nature of the publication, and not the mechanism by which it's made available, but I don't think that anybody could read what we've said or anything we're asking this court to say and discern that if you wanted to write a book about gunsmithing or if you wanted to write a historical or scientific exchange that that is what we're talking about here. What you're talking about here, as I understand it, are the plans or directions for the machines here to make either a plastic one-shot handgun or to make an untraceable AR-15. Is that what we're talking about? That's what we're talking about, Your Honor. That's correct. And putting it on the internet, which you interpret as being export. The export is when it's transmitted to a foreign national, and if you put it on the internet, then you've made no protection against that happening. And there's concrete discussion in the State Department's declaration, the Aguirre Declaration in this case. There are countries that have different firearms laws that we do that don't have a Second Amendment. So if you're in the United Kingdom or in Japan, if you can print firearms in your basement, that undermines those restrictions, and that creates a foreign policy problem. It's a legitimate foreign policy problem for the State Department to address. You mentioned untraceable weapons. There are terrorist groups, drug cartels, there are any number of people. Drug cartels have a pretty easy time getting guns from this country, don't they? Your Honor, we— It seems absurd to think that they would go to the lengths, or they or terrorists, of quote producing their own weapons when the world is awash in weapons produced by big companies. Your Honor, I don't concede that the federal government has to abandon all efforts to keep guns out of the hands of people who are trying to do harm. But it seems particularly—you read Reed v. Town of Gilbert, did you not? Of course, Your Honor. The problem with this kind of overbroad content regulation is that it enables the person who's doing the censoring to pick and choose what it's going to censor. Your Honor, there are specific definitions in the regulations. They were applied here. Well, you took—they are not specific. They are extremely vague. Foreign means, quote, exposed to any foreigner. Well, you expose anything to a foreigner if you put it in popular mechanics produced in English or if you, again, put it in the local library, correct? It really depends on the circumstances? It does not depend on—a public library is a public library, isn't it? Your Honor, exposed to a foreigner is not the standard. The standard is transmission to a foreign national, and the point that we are not saying that if no foreign person ever touches it that you've committed a violation. Well, but you said that republication is also a violation. So if the library—so if they sent it to the library, and if the library let a foreign person come in the library who had a beard and looked foreign, and that person checked out that book, then according to you, the library would be vulnerable to prosecution. Well, prosecution would require willfulness, and even the public—you know, the State Department is still— By censorship of the library. Your Honor, as you mentioned, the State Department is engaged in a rulemaking on this. The State Department's understanding thus far is that you would have to have knowledge that it was put in the public domain. The most recent statement by the State Department was issued two days ago, sent to us in a 28J letter, and it said that our present interpretation of the ITARS has not changed. In other words, that it is precisely what you are contending in this lawsuit. So it has nothing to do with evolving standards. I wasn't trying to invoke evolving standards. I was trying to be precise, Your Honor. But in answer to your question about republication, the standard that was alluded to a year ago, which is the one that I believe we're being held to in this litigation, is that unless you had knowledge that it was put out originally in violation of the regulations, then you would be clear. Now, but again, we're already quite far afield from what we're talking about here, Your Honor, because this was a specific request. It was a request not about information— It was not a request. They published it because no gun publication had been censored from the Internet before, and then after the publication had been downloaded 100,000 times, the State Department hauls in and says, you have to take that down. And then they sought the license in an effort to comply. Two years later, the State Department told them it was a violation. Well, let me rephrase then, Your Honor. If I was imprecise, we are talking about particular files. They have—these are files, as we've discussed earlier, that teach a computer, not a person, how to make weapons that are on the U.S. munitions list. And the State Department reasonably concluded that that was beyond anything that was up till then in the public domain, and therefore it fell within the regulations, and the State Don't you think that Browning, if Browning still exists, or Remington Arms produces regular guns with computer-assisted technology today? Your Honor, I don't know the answer to that. Of course they do, because every manufacturing—I haven't looked it up, but every manufacturing concern in the United States in order to save money and be efficient and so on has adopted computer-assisted technology. If my hypothetical—we'll call it a hypothetical—is correct, then you're saying that no publication about computer-assisted technology in manufacturing could be published on the Internet. Is that your position? No, it is not our position. Why not? Because— It involves guns? Your Honor, this goes back to the question that was posed earlier about the ghost-gunner machine. The ghost-gunner machine was determined by the State Department, and this is in the record in this case. Is every gun on the U.S. munitions list? It covers, you know, at least— In quotes, guns. I mean, I don't want to say categorically, but for purposes of this discussion, we're not relying on any guns that would be exempt from the list, Your Honor. So it's a quite broad category, we concede. But to go back to the ghost-gunner machine, that machine is not subject to the regulations, because it is not, as these files are, something that is specifically designed to make something on a munitions list. And if you go back to Edler, opposing counsel talked about Edler. Edler was talking about— But there's—you're being—you are not being accurate about the munitions list. It is—you are simply relying on your post hoc justification, because CD—what do you call it—3D printed plastic weaponry was not a specific category on the U.S. munitions list. Article 1 of that list covers, quote, guns. Your Honor, firearms up to a certain caliber, yes, Your Honor, but— Yes, sir. But with the only exceptions being pellet guns and BB guns and firearms above 50 caliber. My understanding isn't that plaintiffs are contending that they could ship the guns themselves overseas. So there's not really a challenge. They're not. Of course they're not, because you can't ship any gun overseas, because it's a, quote, gun, and you have to get a license for the, quote, gun. Right. But this has to do—I'm sorry to—but you're being, in my view, somewhat evasive. Doesn't the State Department exercise some discretion about what guns they're going to give licenses for and what they're not going to give licenses for? Yes, of course they do, Your Honor. But in terms of—the point I was trying to get at, and I am not trying to be evasive, Your Honor, and I apologize if it comes across that way. But the point I was trying to get at is that the issue here isn't about whether these are guns or not. The issue is about whether this is technical data that's covered by the regulatory definitions of that term. And the regulatory definitions of that term include an exception for information that was in the public domain, which would include the vast majority we submit of information about gunsmithing and generic information that you would give to another person. What the State Department specifically found in this case, and this is in the declaration, is that these are different from what was already out there because they have the functional capacity to teach a device to make the firearm without the sort of human intervention that would otherwise have been covered. Now, that is what makes—that's the reason that we're regulating this and we're not regulating other things. The only problem with that is that it is a prior restraint because there is no—until two years after the fact, the State Department did not explain any basis for regulating this item. And, therefore, the very—in specific nature of this has First Amendment implications. Your Honor, we're not urging there's no First Amendment implications here at all. Our position is that any limitation on First Amendment freedoms, particularly when we're talking about something regulated for its functional content, is adequate here. I see my time has expired. If there are more questions, I'm happy to answer them. Okay. Thank you very much. Thank you. Okay, Mr. Gura, back to you, sir. Thank you, Your Honor. Courts have held that even if speech does have some sort of functional component, it's still expressive if people can understand it and use it to communicate information amongst each other. That's why sheet music, for example, which is nothing but a form of code that perhaps some machines could read and generate music out of it, a function, would be still protected by the First Amendment. Same thing with software. And here we're talking about design files. We're also talking about more than CAD files. We're talking about blueprints. We're talking about instructions. We're talking about just about anything that can be technical data. Let me ask you, was I incorrect in asserting that the government had conceded that if your client were to publish this information in a library or a magazine or at political speeches or on Pacer, that those would not be covered by their license requirement? Your Honor, they've taken inconsistent positions on that, and we're not sure what the answer is on that question as far as they're concerned. On the one hand, they've taken the position that said, oh, back in the Bernstein case, we don't care about how you put things into the public domain. But now they're saying the public domain, it has to be there already. How do we get this information into the public domain? So to go to Judge Davis's question, and this is important, I recall from the early days of computers, and maybe this is still going on, but it was definitely going on when I was a kid, you could buy these books that had – they would have code in them. You didn't buy the disc or the tape, but you could type in the code into the computer and hit the compile button, and the thing would run the program. Now, if we took this file, these CAD files, as code, published them in a book that a person could sit in front of the computer, enter it into their compiler or what have you, and out comes the same file that would otherwise be downloaded on the Internet, they would have a problem with the book. It's unclear. It's the same data. It would achieve the same function. But suddenly there would be a problem. And is the issue really here political? I mean, I hate to bring it up, but we're talking about guns because this case arose in the context of guns, but guns is not the reason why we have 10,000 comments from universities, from GE and IBM, from all these people, from former ITAR officials who are saying this is way over broad control of speech under the guise of technical data. Let's suppose that we weren't talking about guns. What if we were talking about something else that's considered to be a fundamental right today? How about abortion and contraception? What if the State Department determined that other countries are offended, deeply religious conservative countries, Saudi Arabia doesn't like the fact that Americans are posting online information about how to terminate a pregnancy? Could the State Department then issue a rule saying in the furtherance of American national security interests and our foreign policy, we're going to ban Americans from instructing people how to do this because a foreigner might hear it and their government might be upset? What about political speech? There are things that I can say online about Vladimir Putin that he might not appreciate. Does the State Department get to come in and censor me because this will impact American foreign policy? I bet there's a lot of speech that other countries are lining up to censor by Americans and this would give them a great entryway into controlling the Internet generally. But in the end, I see my time is up, Your Honors, if I may just finish the thought. It's really more like the Schneider case. This is the way that we communicate information today, the Internet. It doesn't matter if you can put it in a book or some other way. This has to be protected. This prior strength cannot be sustained. I urge the Court to reverse it. Thank you, Your Honors. Thank you very much. You very well argued the case. Thank you.